UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-00956-JPH-DLP |
| | ) |
| SELECTIVE INSURANCE COMPANY OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTIONS**

Jeff Smiley accidentally flipped his vehicle on an interstate, seriously injuring his passenger, Greg Callahan. In a prior case, Mr. Callahan sued Mr. Smiley to recover damages for his injuries, and Cincinnati Insurance and Selective Insurance—who insured Mr. Smiley—eventually settled with Mr. Callahan. In this case, Cincinnati sued Selective, alleging that Selective acted negligently and in bad faith in refusing to settle Mr. Callahan's case sooner. Selective has filed a motion to dismiss or, in the alternative, for summary judgment. Because no reasonable jury could find that Selective acted in bad faith in contesting coverage, Selective's motion for summary judgment is **GRANTED** on the bad faith claim. Dkt. [36]. Because the negligence claim turns on questions that are unresolved under Indiana law, the parties are **ORDERED** to submit briefs addressing potential certification of those questions to the Indiana Supreme Court.

1

# I.
# Facts and Background

Because Selective has moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Cincinnati and draws all reasonable inferences in its favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).[1]

## A. The Accident and the Parties

In February 2015, Jeff Smiley drove a truck owned by his auto repair shop, Smiley Body Shop, on an interstate. Dkt. 38-2 at 4–5, 10 (Hahn Dep. 38:12–39:3, 44:14–16). Greg Callahan was traveling with Mr. Smiley. *Id.* at 5 (39:1–3). Mr. Callahan had worked for Smiley Body Shop "essentially [as] a full[-]time employee" for "nearly five months" in 2009, doing "odd jobs around the shop." Dkt. 36-12 at 4. After that five-month period, Mr. Callahan "would occasionally do work for Smiley either personally or for one of Smiley's businesses or trusts and was paid by the job." Dkt. 36-11 at 6.

Mr. Smiley unexpectedly lost control of the truck, causing it to flip over in a "catastrophic" accident. Dkt. 38-2 at 5, 7 (Hahn Dep. 39:16–25, 41:5–6). As a result, Mr. Callahan sustained a head wound and broke his neck, dkt. 36-12 at 2, leaving him permanently paralyzed, unable to walk, and confined to a

---

[1] Cincinnati has also moved for summary judgment, meaning the Court would normally interpret the evidence in a light most favorable to Selective when considering Cincinnati's motion. *See Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). Here, however, even when all evidence is interpreted in Cincinnati's favor, Selective is still entitled to summary judgment on the bad faith claim.

wheelchair, dkt. 38-2 at 6–7 (Hahn Dep. 40:1–41:4).  His injuries resulted in over $700,000 worth of medical bills.  Dkt. 36-11 at 3.

At the time of the accident, Selective insured Mr. Smiley and Smiley Body Shop with a commercial insurance policy providing $3 million in primary coverage.  *See* dkt. 10-3 at 245.  Mr. Smiley also had a personal insurance policy with Cincinnati, which provided $1 million in umbrella coverage.  *See* dkt. 10-2 at 1.

### B. Procedural History

This action is the third lawsuit arising out of this accident.  In the first case, Mr. Callahan sued Mr. Smiley and Smiley Body Shop in Indiana state court for his personal injuries from the accident ("personal injury suit").  *See Callahan v. Smiley*, No. 27D02-1504-CT-000025 (Ind. Super. Ct. filed Apr. 24, 2015).  In the second case, Smiley's primary insurance provider, Selective, filed a declaratory action seeking a determination as to whether its policy covered Mr. Callahan's claim ("declaratory action").  *See Selective Ins. Co. of Am. v. Smiley*, No. 1:16-CV-00062-JMS-MJD (S.D. Ind. filed Jan. 6, 2016).  Now, in this case, Smiley's excess insurance provider, Cincinnati, has sued Selective for its handling of Mr. Callahan's personal injury suit ("current action").

#### 1. Personal Injury Suit and Early Settlement Negotiations

In the personal injury suit, Mr. Callahan sued Mr. Smiley and Smiley Body Shop, asserting a claim for negligence and seeking damages for his personal injuries from the accident.  Dkt. 36-10 at 3.  Selective controlled Mr.

Smiley's defense "subject to a full and complete reservation of rights," meaning it reserved the right to disclaim coverage if an exclusion applied. *Id.* at 2, 14.

Mr. Callahan sent Selective a written demand for $3 million to settle his personal injury suit. Dkt. 36-15 at 11 (R.10). Cincinnati set its loss reserve at $1 million. Dkt. 36-5 at 7, 14 (Homan Dep. 51:11–16, 58:8–23); dkt. 36-6 at 2. A loss reserve "reflects the most likely exposure to the company" and "takes into account the severity of the damages, the liability of the insured, and any coverage defenses." Dkt. 36-5 at 6 (Homan Dep. 50:17–25).

On December 4, 2015, Cincinnati demanded "that Selective take immediate steps to promptly settle the Callahan litigation within the available insurance coverage provided by Selective." Dkt. 10-5 at 2. Cincinnati argued that, by settling "before the opportunity to settle is forever lost," Selective could both "protect[] its insureds from a potential judgment in excess of its available coverage" and "also protect Cincinnati from any potential obligation to contribute to any settlement above the current settlement demand of $3,000,000." *Id.*

On December 7, Selective made an internal note stating that Cincinnati asked it to "pay the limits now so that th[eir] $1M does not get exposed." Dkt. 44-3 at 4. That same day, Selective set its own loss reserve at $245,099. Dkt. 38-7 at 3. Yet on December 8, Selective's adjuster on the claim, dkt. 38-2 at 23 (Hahn Dep. 62:23–25), recommended a loss reserve of $1.5 million, dkt. 38-7 at 5. However, Selective did not increase the reserve above the original $245,099. *See* dkt. 38-7 at 3.

4

### 2. Declaratory Action Filed

Both Selective and Cincinnati contested coverage. Dkt. 36-10 at 14–16; dkt. 36-5 at 20 (Homan Dep. 64:18–25). Neither Selective's nor Cincinnati's policy covered bodily injury of an "employee" of Smiley Body Shop. *See* dkt. 36-10 at 15–16 (Selective's policy exclusions); dkt. 36-9 (Cincinnati's). Cincinnati's policy also excluded any "[b]odily injury . . . arising out of a 'business' or 'business property.'" Dkt. 36-9 at 4. So Cincinnati had no "need [to] establish an employment relationship between Mr. Smiley and Mr. Callahan" to deny coverage for Mr. Callahan's claim; it only had to prove that the two of them "were engaged in Mr. Smiley's business." Dkt. 36-4 at 9.

On January 6, 2016, Selective filed the declaratory action against Mr. Smiley and Smiley Body Shop, seeking a determination as to whether its policy covered Mr. Callahan's claim. *See Selective*, No. 1:16-CV-00062-JMS-MJD, dkt. 1. Selective moved for summary judgment, arguing in part that its policy excluded coverage for the claim because Mr. Callahan's "injuries arose out of and in the course of his employment . . . related to [Smiley Body Shop's] business." Dkt. 36-8 at 3. Cincinnati intervened and filed a motion for summary judgment, also arguing that its policy did not cover the claim because Mr. Callahan was an employee at the time. Dkt. 36-13 at 15.

### 3. Personal Injury Suit Negotiations Continued

As the declaratory action remained pending, the parties engaged in settlement negotiations on Mr. Callahan's personal injury suit. *See, e.g.*, dkt. 36-11; dkt. 36-12. In September 2016, Selective's counsel concluded that Mr.

5

Callahan likely had no fault for the accident. Dkt. 38-3 at 14 (Valle Dep. 37:21–25); dkt. 38-2 at 14 (Hahn Dep. 48:9–14). Selective's counsel placed a settlement value of the personal injury suit at $3 to $5 million, though others at the law firm valued it at up to $6 million. Dkt. 38-3 at 15 (Valle Dep. 38:14–20). But this evaluation "did not consider any potential issues with coverage" under Selective's insurance policy. *Id.* at 35. Cincinnati's counsel also advised Selective that it "value[d] the case between $5–7 million." *Id.* at 48.

On November 18, 2016, the parties attended a mediation at which Mr. Callahan demanded nearly $3 million to settle his personal injury suit. Dkt. 38-2 at 40 (Hahn Dep. 81:16–23); dkt. 36-15 at 11 (R. 10). In response, Selective offered Mr. Callahan $50,000. Dkt. 38-2 at 41 (Hahn Dep. 82:2–6). Cincinnati said it "may be willing to contribute to a full and final settlement of Mr. Callahan's claim, but only after Selective has tendered the limits of coverage under its policy." Dkt. 36-11 at 11.

In December, Mr. Callahan demanded $2,995,000 or he would be unwilling to settle the case "for anything less than the applicable policy limits" of $4 million after January 15, 2017. Dkt. 38-3 at 52–53. On January 5, Cincinnati urged Selective to pay the demand, *id.* at 57, but Selective decided "not to meet the demand to settle for almost the policy limits . . . because of the coverage issue," dkt. 38-2 at 48 (Hahn Dep. 89:16–21). Selective offered Mr. Callahan $150,000 on January 9. Dkt. 36-15 at 11 (R. 10).

On April 5, 2017, Cincinnati raised the issue of Selective acting in bad faith to Magistrate Judge Dinsmore. Dkt. 36-12 at 6. Later that month, the

parties participated in a settlement conference, but "there were no significant moves by . . . Selective," dkt. 36-4 at 3–4, and Mr. Callahan again demanded around $3 million, dkt. 36-15 at 11 (R. 10). Cincinnati's notes indicate that it believed "Selective [wa]s acting in bad faith" because Mr. Callahan's "demand was within the primary layer of coverage." Dkt. 36-4 at 3–4.

On April 28, Cincinnati's counsel emailed Selective demanding that it settle the case because it had a "fiduciary duty to . . . put the interests of [Mr.] Smiley and Cincinnati ahead of its own," notwithstanding Selective's argument that it "is somehow protected from a bad faith claim." *Id.* at 4–5. Cincinnati then warned that if "Selective refuses to settle the Callahan case today, Cincinnati will enter into settlement discussions with Mr. Callahan to settle Mr. Callahan's claims, notwithstanding the priority issue." *Id.* Cincinnati concluded that it "hope[d] that Selective will abandon its dangerous pursuit of its policy defenses." *Id.*

### 4. Declaratory Action Summary Judgment Order

On May 26, 2017, Chief Judge Magnus-Stinson denied summary judgment in part in the declaratory action. Dkt. 10-4 at 21–22, 32. The court first noted that Selective's policy was primary, so Cincinnati's policy would provide coverage only after Mr. Callahan's damages exceeded the $3 million in coverage from Selective. *Id.* at 9. Next, because "whether an individual is an employee is a question for the trier of fact" and because the record was "replete with disputed facts," the court held that "genuine issues of fact . . . preclude[d] summary judgment." *Id.* at 19–21.

7

### 5.     Final Personal Injury Suit Negotiations and Settlement

On June 5, 2017, Cincinnati again urged Selective to pay the $3 million settlement demand on Mr. Callahan's personal injury suit before the case could go to trial. Dkt. 10-7 at 2. On June 13, Mr. Callahan demanded $4 million. Dkt. 38-2 at 62 (Hahn Dep. 103:6–17); dkt. 36-15 at 11 (R. 10). Cincinnati urged Selective to pay this amount "notwithstanding the fact that the demand exceeds Selective's limits of coverage." Dkt. 10-8 at 2. Selective, however, did not agree and offered $250,000 at a settlement conference on June 30, 2017. Dkt. 38-2 at 55–56 (Hahn Dep. 96:21–97:11); dkt. 36-15 at 11 (R. 10).

Cincinnati then pursued settlement directly with Mr. Callahan, dkt. 38-4 at 5–6 (Homan Dep. 86:21–87:12), and, on July 25, 2017, settled Mr. Callahan's claims against it for $600,000, dkt. 10-9 at 6, 14. Selective, on the other hand, took the coverage question in its declaratory action to a jury trial. *See* dkt. 36-14. In August 2017, the jury found that Mr. Callahan was not an employee of Smiley Body Shop at the time of the accident. *Id.* at 2. On October 27, 2017, Selective settled the personal injury suit with Mr. Callahan for $2,996,532.41. Dkt. 36-3 at 2, 7.

### 6.     The Current Action

In March 2018, Cincinnati brought this action against Selective, dkt. 1, alleging that Cincinnati "possesses an equitable right of subrogation against Selective" as an excess insurer of Mr. Smiley, dkt. 10 at 6 ¶ 20. The complaint brought two claims: (1) bad faith refusal to settle and (2) negligent refusal to settle. *Id.* at 6–9 ¶¶ 21–33. Selective has filed a motion to dismiss or, in the

8

alternative, a motion for summary judgment. Dkt. 36. Cincinnati has filed a cross motion for summary judgment. Dkt. 38.

## II.
## Applicable Law

Summary judgment[2] shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing . . . a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). Since Indiana substantive law governs this case, the Court must "apply Indiana law by doing [its] best to predict how the Indiana Supreme Court would decide" the issues. *Webber v. Butner*, 923 F.3d 479, 480–82 (7th Cir. 2019).

---

[2] The parties presented "matters outside the pleadings" in this joint filing, so Selective's motion to dismiss is treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). Because both parties had notice of Selective's motion for summary judgment and an opportunity to respond with evidentiary material, this conversion poses no problem and does not alter the case's outcome. *See Thompson v. Cope*, 900 F.3d 414, 425–26 (7th Cir. 2018).

## III.
## Analysis

### A. Bad Faith Refusal to Settle

Selective argues that it is entitled to judgment on Cincinnati's claim of bad faith refusal to settle because Indiana does not permit a third party to assert an insured's bad faith claim against its insurer through the doctrine of equitable subrogation. Dkt. 37 at 17. Selective also argues that its coverage dispute was well founded and that Cincinnati has not shown otherwise. *Id.* at 23.

Indiana "recognize[s] a cause of action in tort for breach of th[e] duty" of "an insurer [to] deal in good faith with its insured." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 517 (Ind. 1993). An insurer breaches this duty when it consciously (1) makes an unfounded refusal to pay policy proceeds, (2) causes an unfounded delay in making payment, (3) deceives the insured, or (4) exercises any unfair advantage to pressure an insured into a settlement of his claim. *Id.* at 519; *see Missler v. State Farm Ins. Co.*, 41 N.E.3d 297, 302 (Ind. Ct. App. 2015) (noting requirement of "conscious wrongdoing"). But "insurance companies may, in good faith, dispute claims" so long as they do not "den[y] liability knowing that there is no rational, principled basis for doing so." *Hickman*, 622 N.E.2d at 520. "To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002).

10

### 1. Equitable subrogation

Selective contends that Indiana law does not allow an excess insurer to bring a refusal-to-settle claim on behalf of its insured under the doctrine of equitable subrogation. Dkt. 37 at 17; *see infra* pp. 15–17 (ordering supplemental briefing on equitable subrogation for negligence claim). Because this order grants Selective summary judgment on the bad faith claim on other grounds, it does not address whether the doctrine of equitable subrogation allows Cincinnati to stand in the shoes of the insured for this claim. *See A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 1002 (7th Cir. 1992) (noting that "when a plaintiff fails on even one element of a claim, summary judgment is appropriate").

### 2. Rational, principled basis for denying coverage

Selective argues that it did not act in bad faith when it did not settle Mr. Callahan's claim sooner because it "properly asserted its coverage defenses," based on "rational" and "well founded" arguments made "in good faith." Dkt. 37 at 20, 23.

Cincinnati counters that "Selective failed to exercise good faith when it refused to settle [Mr.] Callahan's claim within its policy limits despite having been informed that there was no legitimate defense." Dkt. 39 at 35 (R. 28). Cincinnati has designated evidence that Selective knew its insured had no *liability* defense, dkt. 38-3 at 14 (Valle Dep. 37:21–25); dkt. 38-2 at 14 (Hahn Dep. 48:9–14), that it knew the case was worth at least $3 million, dkt. 38-3 at 15 (Valle Dep. 38:14–20), that Selective's claim adjuster recommended a loss

11

reserve of $1.5 million, dkt. 38-7 at 5, and that Selective chose much lower settlement offers than these valuations, dkt. 38-2 at 41 (Hahn Dep. 82:2–6) ($50,000 offer); dkt. 36-15 at 11 (R. 10) ($150,000 offer; $250,000 offer); dkt. 38-2 at 55–56 (Hahn Dep. 96:21–97:11).

This evidence goes to the lack of a liability defense and does not establish the absence of a rational basis for Selective's coverage defense. Selective knew its insured faced liability, but it decided not to pursue settlement "until the coverage issue was worked out." Dkt. 38-3 at 19 (Valle Dep. 42:7–12). Selective took the position that Mr. Callahan was an employee at the time of the accident and therefore his claim was not covered by its policy. Dkt. 36-8.

"Who constitutes an 'employee' . . . is a recurring question." *Smith v. Castaways Family Diner*, 453 F.3d 971, 975 (7th Cir. 2006). Indiana uses a ten-factor test when deciding employment status. *See Moberly v. Day*, 757 N.E.2d 1007, 1009 (Ind. 2001) (quoting Restatement (Second) of Agency § 220 (Am. Law. Inst. 1958)). And courts have struggled to apply the Restatement's test, lamenting that it "is not especially amenable to any sort of bright-line rule." *FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492, 496 (D.C. Cir. 2009). Recognizing the test's complexity, courts in this district have held that the test is "ill-suited for determination by the Court at the summary judgment stage." *Cox v. Gannett Co., Inc.*, No. 1:15-CV-02075-JMS-TAB, 2017 WL 5257135, at *11 (S.D. Ind. Sept. 19, 2017). The fact that Selective's application of this test ultimately differed from the jury's therefore does not suggest bad faith. *See Freidline*, 774 N.E.2d at 40 (rejecting plaintiff's bad faith claim even though

insurer's coverage defense failed); *see also Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers Mut. Ins. Co.*, 779 N.E.2d 21, 30 (Ind. Ct. App. 2002) (affirming summary judgment for defendant on bad faith claim despite possibility of coverage liability).

This is evident from Chief Judge Magnus-Stinson's decision that Selective had designated evidence from which a reasonable juror could find that Mr. Callahan was an employee. Dkt. 10-4 at 21–22. That is a rational, principled basis for denying liability. If Selective's defense had no rational basis, then no reasonable juror could have found that Mr. Callahan was an employee, and Smiley and Smiley Body Shop's motion for summary judgment on this issue should have been granted. *See Selective*, No. 1:16-CV-00062, dkt. 90. Because Cincinnati has designated no evidence showing that Selective pursued this litigation without a rational basis, Selective did not act in bad faith in disputing coverage.

### 3. Refusal to settle within policy limits

Cincinnati claims that Selective acted in bad faith by "actively and deliberately refus[ing] to settle Callahan's claim within the limits of the Selective policy." Dkt. 39 at 23 (R. 16). Cincinnati designates evidence of the many demands made to Selective to settle. *See* dkt. 36-15 at 11 (R. 10) (9/15/15 demand for $3M); dkt. 10-5 at 2 (12/4/15 demand for $3M); dkt. 36-15 at 11 (R. 10) (11/18/16 demand for $2.95M); *id.* (12/15/16 demand for $2.95M); dkt. 38-3 at 57 (1/5/17 demand); dkt. 36-15 at 11 (R. 10) (4/21/17 demand for ~$3M); dkt. 36-4 at 4–5 (4/28/17 demand); dkt. 10-7 at 2 (6/5/17

13

demand for $3M); dkt. 36-15 at 11 (R. 10) (6/13/17 demand for $4M); *id.* (6/30/17 demand for $4M).

However, Cincinnati does not contest that Selective settled Mr. Callahan's claim within the policy limits on October 27, 2017. *See* dkt. 36-3 at 2, 7. So Cincinnati does not seek to hold Selective liable for failing to settle the personal injury suit; it seeks to hold it liable for not settling the case *sooner— i.e.,* before Cincinnati did three months earlier, on July 25, 2017, dkt. 10-9 at 6, 14. Moreover, Cincinnati has not cited any authority holding that an insurer's duty to act in good faith requires it to settle a case before an excess insurer does so.

To be sure, "liability of the insurer under an excess insurance clause arises only after the limits of the primary policy are exhausted." *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1062 (Ind. 2001). But Cincinnati has not shown that this imposes a duty on Selective to settle more quickly than it did, especially given the context of an ongoing, good-faith coverage dispute. Cincinnati has thus not met its burden to identify "specific facts showing that there is a genuine issue for trial" on its bad faith claim. *See Celotex*, 477 U.S. at 324.

\* \* \*

At bottom, no reasonable juror could conclude that Selective acted in bad faith under the circumstances. Asking a jury to hear a disputed question of fact over a frequently litigated issue in a complicated area of law does not

violate a duty of good faith. Nor does waiting to settle a case until that issue is decided.

### B. Potential Certified Questions

Selective next argues that it is entitled to judgment on Cincinnati's claim of negligent failure to settle. Dkt. 37 at 12. Selective argues that the claim fails because Indiana does not recognize a cause of action for negligent refusal to settle. *Id.* at 12. Cincinnati responds that Indiana does recognize such a claim. Dkt. 39 at 12 (R. 5).

The Seventh Circuit has held that Indiana recognizes a cause of action when an insurer negligently refuses to settle a case. *See Certain Underwriters of Lloyd's & Companies Subscribing to Excess Aviation Liab. Ins. Policy No. FL-10959 A & B v. Gen. Acc. Ins. Co. of Am.*, 909 F.2d 228, 231 (7th Cir. 1990); *Anderson v. St. Paul Mercury Indem. Co.*, 340 F.2d 406, 409 (7th Cir. 1965). In *Lloyd's*, the Seventh Circuit held that "[u]nder Indiana law, an insurer is liable to its insured for a judgment exceeding policy limits when the insurer, who has exclusive control of defending and settling the suit, refuses, in negligence or bad faith, to settle within the policy limits." 909 F.2d at 231–32.

Selective argues that *Hickman*, 622 N.E.2d 515, an Indiana case that was decided after *Lloyd's* and *Anderson*, calls into question whether Indiana would recognize a cause of action for negligent refusal to settle. Dkt. 37 at 16. In *Hickman*, the Indiana Supreme Court "reaffirm[ed] the existence of a duty that an insurer deal in good faith with its insured, and . . . recognize[d] a cause of action in tort for breach of that duty." 622 N.E.2d at 517. But the Indiana

15

Supreme Court did not mention or recognize a cause of action for an insurer's negligent refusal to settle a lawsuit. *See id.* As a result, it's unclear whether the Indiana Supreme Court, in recognizing a cause of action against an insurer for bad faith refusal to settle in *Hickman,* excluded a cause of action for negligent refusal to settle.

Even if a cause of action exists, the parties dispute whether Indiana law allows an excess insurer to sue on behalf of its insured under the doctrine of equitable subrogation. Dkt. 37 at 17; dkt. 39 at 32 (R. 25). The Seventh Circuit in *Lloyd's* "determined that Indiana would allow an excess carrier to sue a primary carrier on the basis of equitable subrogation." 909 F.2d at 233; *see also Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Am.*, 93 F. Supp. 2d 982, 989 (S.D. Ind. 2000) (stating that "excess insurers have been allowed to assert claims against the primary insurer under equitable subrogation"). But while federal courts have "predicted that Indiana will allow an excess insurer to bring an action against a primary insurer under equitable subrogation," the Indiana Court of Appeals in 2007 said that the issue "has not been decided by an Indiana appellate court." *Querrey & Harrow, Ltd. v. Transcon. Ins. Co.*, 861 N.E.2d 719, 724 n.3 (Ind. Ct. App. 2007), *transfer granted, opinion vacated* (Aug. 7, 2007), *opinion adopted*, 885 N.E.2d 1235 (Ind. 2008).

While the Court must follow Seventh Circuit precedent, *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004), it must also "apply Indiana law by doing [its] best to predict how the Indiana Supreme Court would decide" the issues, *Webber*, 923 F.3d at 482. Indiana decisions

16

that were issued after *Lloyd's* was decided in 1990—*Hickman* in 1993 and *Querrey & Harrow* in 2007—make unclear what the Indiana Supreme Court would say with respect to the questions of Indiana law decided in *Lloyd's*. And when "state law is unsettled," federal courts have "discretion" to certify questions to state high courts. *McKesson v. Doe*, No. 19-1108, 2020 WL 6385692, at *2–3 (U.S. Nov. 2, 2020) (per curiam) (remanding because the lower court "should not have ventured into so uncertain an area of tort law. . . without first seeking guidance on potentially controlling [state] law from the [state] Supreme Court.").

Indiana allows "any federal district court" to "certify a question of Indiana law to the [Indiana] Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Ind. R. App. P. 64. Here, the remaining issues on summary judgment present questions that appear to meet that standard—is there a cause of action for negligent refusal to settle a case and, if so, can a third party assert such claim against an insurer through the doctrine of equitable subrogation? The Court has not identified "clear controlling Indiana precedent" on either question and each may be determinative to the outcome of the case. *See* Ind. R. App. P. 64.

The parties are therefore **ORDERED** to file briefs by **December 30, 2020** addressing whether the Court should certify either or both questions identified above to the Indiana Supreme Court and, if so, how the Court should frame the question(s) to be certified.

## IV.
## Conclusion

Selective's motion for summary judgment, dkt. [36], is **GRANTED** on the bad faith claim, and Cincinnati's motion for summary judgment, dkt. [38], on the same issue is **DENIED**.  Those motions are otherwise **DENIED without prejudice** pending additional briefing.  As described above, the parties are **ORDERED** to file supplemental briefs consistent with this order by **December 30, 2020**.

**SO ORDERED.**

Date: 11/30/2020

                                                        James Patrick Hanlon
                                                       United States District Judge
                                                       Southern District of Indiana

Distribution:

David A. Mack
HUELAT & MACK P.C.
dmack@huelatandmack.com

Nicole E. Wilinski
COLLINS EINHORN FARRELL PC
nicole.wilinski@ceflawyers.com